Marcus G. Christ, J.
These are two actions which each have their origin in the same contract for the sale of real property. As the result of an order of consolidation, they were tried together before the court without a jury. The real property which is the subject matter of these lawsuits is situated in the village of North Hills in the county of Nassau. There are two tracts involved. One of these is a parcel containing approxi *541 mately 140 acres, on which is situated a dwelling house together with various accessory building’s, commonly known and referred to in this litigation as “ Tullaroan ”. The other tract, comprising one parcel of approximately 53 acres and another of approximately 1 acre, is unimproved and is commonly known and referred to in this litigation as “ Arthur Farm ”. These properties formerly belonged to Joseph P. Grace and Janet Grace, his wife, both of whom are deceased.
THE PBOPEBTY
Tullaroan originally was a part of the corpus of an inter vivos trust created by the late Janet Grace for the benefit of her husband, Joseph P. Grace, Sr. Title to Tullaroan passed upon the death of Joseph P. Grace, Sr., pursuant to the exercise of a power of appointment, to the four children of Joseph P. Grace, Sr. and Janet Grace, his wife, who thereafter and at the time of the making of the contract of sale herein, held their title as tenants in common. These children are: Michael P. Grace, II (hereafter ‘ ‘ Michael Grace”), Joseph P. Grace, Jr. (hereafter “Peter Grace”), Charles MacDonald Grace (hereafter “Charles Grace”) and Janet Maureen Grace, an incompetent person (hereinafter sometimes referred to as the “ incompetent ”).
The tract known as Arthur Farm was one of the assets included in the corpus of a testamentary trust created by the late Janet Grace for the benefit of her four children, with the remainder over to their surviving issue. Pursuant to the provisions of such trust, fractional interests in this particular property, prior to the making of the contract in question, had been transferred to the three sons of the late Janet Grace. At the time the contract of sale was executed, title to Arthur Farm was vested in the three sons of Janet Grace, both in their individual capacities and as trustees of the testamentary trust established by their mother.
THE ACTIONS
Throughout the trial, as the record will show, these two actions were customarily referred to as “Action No. 1” and “ Action No. 2 ”, despite the fact that this designation of the two actions does not correctly indicate the chronological order in which the two actions were commenced.
Action No. 1 is the action entitled “ Michael P. Grace, 11, etc. against Deepdale, Inc., et al.” Action No. 2 is the action entitled “ Corinne E. Grace, etc. against Joseph P. Grace, Jr. et al.” Although the end result sought to be achieved in both actions is substantially the same, namely, rescission and can *542 ceUation of the contract of sale, the parties involved and the specific relief sought are not identical in form. It is therefore necessary at the outset to describe the nature of each of these two actions.
ACTION NO. 1-PARTIES AND THEIR CONTENTIONS
The plaintiff in Action No. 1 is Michael Grace suing both individually and in his capacity as a trustee of the testamentary trust created by his late mother, Janet Grace. In this suit Michael Grace, suing in the dual capacity just described, seeks to rescind the contract of sale upon the ground that he was induced to enter into the contract by fraud. As defendants he has joined the following parties:
1. Deepdale, Inc., a golf club which contemplates leasing the property from the contract purchaser, Real Property Owners, Inc.;
2. Real Property Owners, Inc. the real estate holding company for the golf club and the purchaser under the contract of sale;
3. Grace National Bank of New York which was dropped from this action upon its motion by an order dated December 11, 1956 upon the ground that the bank had no interest in the subject matter of this action.
4. Committee of Janet Maureen Grace, by Grace National Bank of New York and Michael P. Grace, II, its members. This defendant is one of the sellers under the contract of sale. Michael Grace has been removed as cocommittee by order dated May 3, 1957. John P. Boland, Esq. was appointed as guardian ad litem for the incompetent, Janet Maureen Grace, by an order dated December 19, 1956 when Grace National Bank of New York and Michael Grace were both members of the committee but in disagreement.
5. Grace Properties, Inc. in Liquidation. This corporate defendant was dropped from the action on its motion by order dated March 15, 1957 upon the ground that it had no interest in the subject matter of the action.
6. Charles Grace, individually and as trustee of the testamentary trust created by his late mother, Janet Grace. He is one of the sellers in the contract of sale.
7. Peter Grace, individually and as trustee of the testamentary trust created by his late mother, Janet Grace. He is one of the sellers in the contract of sale.
8. Albert Jorgensen. This defendant is the real estate broker involved in the transaction covered by the contract of sale. However, this defendant was never served in the action.
*543 From the foregoing it is seen that the only defendants among those originally named by the plaintiff who are subject to the jurisdiction of this court are: Deepdale, Inc., Beal Property Owners, Inc., the committee for the incompetent, the incompetent’s guardian ad litem, Charles Grace and Peter Grace.
The complaint in Action No. 1 alleges that the defendants fraudulently conspired to induce the plaintiff in both his individual and fiduciary capacities to sell the real property covered by the contract of sale at less than its value. The gravamen of the alleged fraud is set forth in allegations contained in paragraphs “11”, “12”, “13”, “14” and “15” of the complaint. It is therein alleged, in substance, that the acts of deception included withholding from the plaintiff information concerning other offers for the property so as to prevent negotiation with other prospective purchasers; concealment and withholding from the plaintiff of knowledge and information concerning the value of the property; concealment and withholding from the plaintiff information to the effect that Charles Grace was an applicant for membership in the golf club or was considered for membership therein or himself was contemplating membership in such club with an interest or proposed interest in Beal Property Owners, Inc., the real estate holding corporation; advising prospective purchasers that the property had been withdrawn from the market and thereby discouraging such prospective purchasers from attempting to buy the property. The plaintiff claims that by reason of these deceptions he was induced to sign the contract of sale in his several capacities and unlawfully hindered and prevented from exercising his judgment or discretion with respect to the sale of the property.
The answers deny these allegations and, in addition, the defendant Beal Property Owners, Inc., by way of counterclaim against the plaintiff Michael Grace and by way of cross claim against the trustees who are its codefendants, asks for a judgment directing specific performance of the contract of sale. It is urged by way of defense that the contract of sale has already been found to be in the best interests of the incompetent in a proceeding had before the Special Term for Incompetency Proceedings of this court. It is asserted that the determination in that proceeding was made after a full hearing at which the very issues raised in this action were fully examined and a determination thereon made adverse to the plaintiff in Action No. 1.
ACTION NO. 2-PARTIES AND THEIR CONTENTIONS
In Action No. 2 Corinne Grace, the wife of Michael Grace, sues as guardian ad litem for their infant child, Michael P. *544 Grace, Jr., who is a contingent remainderman under the testamentary trust created by his paternal grandmother, the late Janet Grace. The relief sought in this action is a judgment enjoining the trustees (Peter Grace, Charles Grace and Michael Grace) from conveying the interest of the trust in the property under contract upon the ground that there exists a conflict of interest between the trustees ’ personal interests and their interests as fiduciaries which makes them incapable of acting on behalf of the trust in connection with this sale. It is further claimed in the first cause of action that the trustees had no right to sell the interest of the trust without court approval. It is also asserted that the sale of the tract known as Tullaroan and the tract known as Arthur Farm as a “ package deal ” was contrary to the best interests of the trust estate. The plaintiff in this action further alleges that the sale should have been delayed to get the benefit of enhanced value which a new highway on the south border of the property would bring as well as the benefit from the increased value which would result from the successful completion of legal proceedings to down-zone the premises. It is also alleged that there were and are more favorable offers for this land.
In the second cause of action it is alleged that Charles Grace ‘ ‘ at the time of and immediately prior to his execution ’ ’ of the contract of sale was an applicant for membership in Deepdale, Inc. and that, in fact, after the execution of the contract of sale he did become a member of that golf club. It is claimed by the plaintiff that these circumstances gave rise to a conflict of interest which disqualified Charles Grace from acting or participating in the decision to sell the trust property and accordingly tainted the contract.
In the third cause of action it is claimed that the land of which Arthur Farm was a part was sold for a contract price which amounted to about $3,300 per acre whereas, it is- alleged, the actual market value per acre of Arthur Farm was approximately $9,000. The plaintiff consequently alleges that the sale by the trustees of the trust property was an improvident exercise of discretion on their part.
The material allegations of plaintiff’s complaint in this Action No. 2 are denied by the defendants other than Michael Grace, except that it is admitted that after the execution of the contract of sale Charles Grace did apply for membership in Deepdale, Inc. The defendant Real Property Owners, Inc., by cross claim seeks to compel specific performance by the trustees.
*545 THE CONSPIRACY
The court finds no evidence that there was a conspiracy in which the purchaser under the contract of sale joined with others to deceive the plaintiff Michael Grace. The purchaser, Real Property Owners, Inc., dealt at arms length with the sellers and their spokesmen. The sellers, including Michael Grace, knew that the purchaser was bargaining to get the property upon the most favorable price and terms. This it had a full right to do and it owed no duty to the seller, including Michael Grace in all his several capacities. By the ancient maxim of caveat emptor, the risks were those of the purchaser and it was entitled to bargain hard. Moreover, there were no better offers than that proposed by Real Property Owners, Inc., at the time of the negotiations which ultimately ripened into the contract of sale. That offer and the prospective purchaser who made it seemed the most likely to produce results and consummate in a sale. It was this offer which Mr. McDeavitt, acting for Peter Grace, pressed for consideration. Michael Grace did not rely upon the statements of the purchaser nor those of the officers of Grace Properties, Inc., but instead engaged independent counsel to advise him. Conferences were held with the prospective purchaser by Michael Grace and his counsel and much, if not most, of the negotiating was done directly by Michael Grace in personal dealings with the prospective purchaser. Michael Grace was not stampeded into a quick deal without opportunity to check and test the statements made to him as well as the values involved. The talks which preceded the ultimate contract of sale began in or about October, 1954 when Mr. Ridder, president of Real Property Owners, Inc., visited Michael Grace at the property and talked with him. The matter remained very much alive from then until January, 1955 at which time it appears to have cooled off. However, at some point it became active again with the contract of sale finally being signed in May, 1955.
There was ample opportunity for Michael Grace to satisfy himself in both his individual and fiduciary capacities as to the desirability or undesirability of selling to this prospective purchaser. The contract of sale covering 21 typewritten pages (exclusive of the 8 pages devoted to Schedules “ A ” and “ B ” containing the descriptions of the real property) was executed by Michael Grace in each of 3 separate capacities and for each of which he subscribed his name separately. Thus, he signed as the seller of an individual interest in the property; he signed as a surviving trustee under the last will and testament of Janet Grace, deceased; and he signed as one of the *546 committee of the property of Janet Maureen Grace, his incompetent sister. His initials “ M.P.G. II ” appear on pages 1, 2, 3, 6, 8, 9, 15, 16 and 18 of the text of the contract of sale and on the first page of each of the schedules containing the description of the property covered by the contract of sale. This in itself is an indication of the intense personal attention which Michael Grace gave to the entire matter. By the time the contract was signed in May, 1955 he had three separate sets of attorneys attending him and advising him. There was no conspiracy. There was no deception attempted and there was no reliance placed by Michael Grace upon those whom he claimed were in duty bound to inform him.
CHARLES GRACE’S MEMBERSHIP IN DEEPDALE, INC.
The matter of, Charles Grace’s membership in Deepdale, Inc., was an issue' in this litigation both in respect to Action No. 1 and Action No. 2. He became a member of Deepdale, Inc., in June, 1955, at least a month after the contract of sale had been executed. There is no evidence that he was invited to join the club before the contract was signed or that his joining was in contemplation until after the contract was signed. When he became a member of the golf club his obligations as a seller under the contract of sale had already come into being and were fully crystallized. Nothing in the situation is found by the court to have been irregular. Charles Grace, in his individual capacity, had a much larger interest in the sale than the interest belonging to the infant plaintiff and he sold his property for the same values as those enuring to the benefit of the infant plaintiff. There was no conflict of interest and no overreaching or breach of the fiduciary relationship.
VALUE AND THE CONTRACT PRICE
In both actions the claim was made that the contract price was less than the fair market value of the property. There is no substance to this claim whether it is regarded as one urged in behalf of the incompetent or as one advanced for the infant plaintiff in Action No. 2. It was necessary for the committee of the incompetent to obtain judicial approval of its participation in the contract of sale. This was required both by article 82 of the Civil Practice Act and was recognized by the statement of the corporate member of the committee on the page immediately following the signature page of the contract of sale. Accordingly, the Grace National Bank of New York, as a member of the committee of the property of the incompetent, insti *547 tuted a proceeding in the Incompetency Term of the Supreme Court for Nassau County for approval of the contract of sale. The petition in that proceeding was verified September 6, 1955, approximately four months after the contract had been signed. Although Michael Grace, four months before, executed the contract which had resulted largely from his own negotiations and to which contract he was a signatory in his various capacities including that of being a member of the committee of his incompetent sister, he nevertheless, in that proceeding, opposed approval of the contract.
In that proceeding Michael Grace asserted, in an affidavit submitted in opposition, that he had been unaware of offers in excess of the contract price and averred, on information and belief, that such an offer had been received prior to the date of the contract but not considered by the corporate fiduciary which, with him, constituted the committee of the incompetent. It was Michael Grace who asked in that proceeding that the court appoint a referee and an appraiser to look into the facts and circumstances which preceded the execution of the contract of sale and especially to inquire into the number, nature and amount of any offers which were received by the corporate member of the committee and to inquire whether such offers were in excess of the price stated in the contract of sale and, if so, why such offers were not considered. The purchaser under the contract of sale, Real Property Owners, Inc., sought and obtained leave to intervene in that proceeding. Mr. Justice Daly appointed a Special Referee and an appraiser whose duties were, respectively, to inquire into and report upon the merits of the application and to make an appraisal of the fair market value of Tullaroan as of May 6, 1955, the contract date. After extensive hearings during which about a dozen and a half witnesses gave a little under a thousand printed pages of testimony, the Referee submitted a report in which he found that it would be to the best interest of the incompetent to dispose of her one-fourth interest in Tullaroan pursuant to the contract of sale dated May 6, 1955. It is significant that after the hearings before the Special Referee had been concluded, but before the Referee had made his report, Michael Grace moved to reopen the hearings for the purpose of taking testimony concerning the fact that following the execution of the contract of sale, Charles Grace became a member of Deepdale, Inc. This application was denied by Mr. Justice Daly by an order dated March 7, 1956. The Referee’s report was confirmed by Mr. Justice Daly in an opinion in that proceeding (Matter of Grace *548 Nat. Bank [Grace, etc.], N. Y. L. J., April 17, 1956, p. 13, col. 6). The approval of the contract by Special Term was affirmed by the Appellate Division (Matter of Grace, 2 A D 2d 222) and on further appeal by Michael Grace the Court of Appeals unanimously affirmed without opinion (Matter of Grace, 2 N Y 2d 822). At the time of the application to confirm the report of the Referee approving the disposition of the interest of the incompetent, Mr. Justice Daly sitting in the Special Term for Incompetency Proceedings thoroughly reviewed the question of value and especially the objections interposed by Michael Grace. In concluding his review of the entire matter, Mr. Justice Daly stated in his opinion: “ The court is of the opinion that the several findings made by the referee have substantial foundation in the record and should not be disturbed.” He accordingly granted the motion to confirm the Referee’s report and approved the disposition of the incompetent’s interest in the property on the terms and conditions set forth in the contract dated May 6, 1955. Thus, before these consolidated actions came to trial, the question of the fairness of the price in respect of the incompetent’s interest had been thoroughly tested in the proceedings before Mr. Justice Daly who found the sale to be at a fair price and for the best interests of Michael Grace’s incompetent sister. The conclusion reached by Mr. Justice Daly was twice affirmed by appellate courts. This court is of the opinion that although such determinations may not be res judicata in these actions now before the court, nevertheless, if in the opinion of Special Term, the Appellate Division and the Court of Appeals this sale was fair and proper so far as the best interests of the incompetent are concerned, the same standards for measuring fairness and propriety in respect of the interest of the infant plaintiff in Action No. 2 would be applicable. Further, if the sale price is fair as to the incompetent and as to the infant plaintiff, it certainly is fair for Michael Grace.
The plaintiff in Action No. 2 called one David Strauss, a real estate appraiser of considerable experience, to testify as to value. His testimony was to the effect that the property was worth reasonably from $5,000 to $6,000 per acre and that, in his opinion, $5,000 per acre was within the range of a fair price. It can thus be seen that if a price of $5,000 per acre is applied to the 194 acres involved, the contract price was in excess of $5,000 per acre. There was much talk of other interest and other offers but prior to the execution of the contract, no offer was made for this property in excess of the sale price and upon terms as favorable as set forth in the contract of sale.
*549 FAILURE TO SEEK CHANGE IN ZONING
Another claim which has been advanced in both actions with the purpose in mind of demonstrating that there was a withholding of information or action having a bearing on the value of the property had to do with the municipal zoning restrictions affecting the property covered by the contract of sale. By the terms of the Zoning Ordinance of the Village of North Hills, the area in which this property is situated is restricted to building plots having a minimum area of two acres. It was urged that if steps to change the zoning restrictions had been pursued, the property might have been down-zoned so as to permit building upon less than two acres. This contention is wholly speculative and there is nothing to show that such a result would have ever been achieved. Moreover, this same contention was raised in the proceeding before Mr. Justice Daly and, in his opinion referred to above, Mr. Justice Daly discussed that contention and disposed of it in the following language: ‘ ‘ The property in which the incompetent has a one-fourth interest is located in a highly restricted two-acre zoned residential area. The objectant claims that since the court-appointed appraiser himself testified that zoning is an important factor in determining market value and there was no pressing financial need to sell the incompetent’s interest, such sale should be deferred to permit proceedings for a change of zone downward, intensive research by his counsel having disclosed no New York case sustaining the validity of a two-acre restriction. In Dilliard v. Village of North Hills (276 App. Div. 969), however, the Appellate Division of the Second Department sustained the validity of the very two-acre restriction here involved in an action brought by the owners of real property in the Village of North Hills, in which is located the property partially owned by the incompetent herein. The conclusion of the referee that the possibility of down-grade zoning of the Tullaroan parcel in North Hills seems remote at the present time or in the foreseeable future is not without sound foundation. ’ ’
No evidence was presented on the trial which in any way indicated that those who would have had the responsibility for challenging the validity of two-acre zoning would have had any greater probability of success at a later date than they had at the time Mr. Justice Daly made the observations quoted above. In the light of the decision in Dilliard v. Village of North Hills (276 App. Div. 969) which upheld the very ordinance controlling this property, the owners and their legal advisors could quite reasonably believe that there would be little likelihood of sue *550 cess for proceedings brought to upset the two-acre zoning requirements. They might reasonably conclude that any legal action brought for that purpose would have to take a course leading ultimately to the Court of Appeals with no assurance, even then, that the result desired would be achieved, especially when it is noted that the Court of Appeals in Matter of Brous v. Smith (304 N. Y. 164, 171) in 1952 cited the case of Dilliard v. Village of North Hills (supra) with approval.
EFFECT OF NEW HIGHWAY ON PROPERTY VALUE
Still another contention made during the trial was that since a new highway was being constructed at the south edge of the property, the sale should have been postponed until that new highway was completed because the existence of the new highway itself would have meant an enhancement in value. There is no proof whatever that the new highway would have in any manner increased the value of the property. Furthermore, it is evident from an examination of the contract of sale that the parties took cognizance of the fact that the new highway was going to affect the premises. Paragraph “ Eleventh ”, among other things, deals with the consequences which shall flow from a taking of the property, or some portion thereof, by eminent domain. In subdivision “ b ” of paragraph ‘ ‘ Eleventh ’ ’ there is found an express reference to the fact that a portion of the premises covered by the contract of sale had been taken or was about to be taken by the State of New York for the Horace Harding Boulevard Extension. That this superhighway was in contemplation was a fact known to Michael Grace for he executed the contract of sale containing this express reference to it. Thus, the contention that the sale should have been delayed in order to obtain the benefits of supposed enhancement of value from the construction of the highway through a portion of the property lacks substance and is without merit.
HALF OF ARTHUR FARM AS SEPARATE PARCEL
It was also claimed that the parcel known as Arthur Farm would have brought a higher price had it been sold as a separate parcel and that it was disadvantageous to the infant plaintiff’s interest to have sold it as part of a “ package deal ” with the tract known as Tullaroan. With this contention the court cannot agree. It is true that there are more buyers with the money to purchase small parcels than there are buyers with sufficient money to buy a large tract. On the other hand, there are fewer large tracts than smaller parcels and, consequently, the increased plottage which is a characteristic of the larger tracts makes for a scarcity value. It is difficult to say which *551 factor has the greater influence and the court cannot find that the separate sale of Arthur Farm would have been in any wise advantageous to the infant plaintiff.
TRUSTEES * RIGHT TO SELL WITHOUT PRIOR COURT APPROVAL
With respect to Action No. 2 the claim was advanced that the testamentary trustees had no right to sell property of the trust without court approval. The court finds that neither the will of the late Janet Grace nor the terms of the contract of sale provide any basis for this contention. Paragraph “ Seventh” of such will provides in part as follows:
‘ ‘ Seventh : I hereby give to the Executors and Trustees under this Will, full power and authority in their discretion to exchange and to sell at public or private sale at such times and places and in such manner and upon such terms as they shall deem best, any and all property, real or personal, of every kind and nature whatsoever at any time held hereunder and to extend the time for the payment of any mortgages or other obligations for the payment of money and to increase or decrease the interest rate thereon and to mortgage or pledge any of said property and to exchange, lease or to rent or otherwise dispose of the same or any part thereof in such manner, for such periods of time without regard to the duration of the trusts created hereunder and without authorisation of any court, and upon such terms and conditions as they shall deem expedient, and to execute, acknowledge and deliver any and all assignments, deeds, agreements extending or otherwise varying the terms of mortgages or other obligations for the payment of money, leases, bonds, mortgages or other instruments under seal or otherwise necessary, proper or convenient for the accomplishment of such purposes ”. (Italics supplied.)
This is a broad power which requires no court approval of any kind on the part of the trustees as a condition precedent to their right to sell.
The contract of sale, in paragraph numbered “ Thirteenth” subdivision “ A ” provides an escape clause for the benefit of the sellers. In substance, it is therein provided that if the committee of the incompetent and/or the trustees of the testamentary trust make application to a court for leave to sell the premises and such leave is denied and the sellers decide not to appeal from such determination or if, having taken such an appeal, the denial of leave is affirmed on appeal, the sellers are to notify the purchaser in writing and thereupon the sole obligation of the sellers becomes that of refunding any deposits made on account of the purchase price by the purchaser together *552 with the net cost of title examination, and upon making such refund and reimbursement the contract becomes null and void and none of the parties has any further claims against the other. Nothing contained in that provision of the contract or elsewhere makes approval of a court of the sale by the testamentary trustees a condition precedent to the attaching of a firm obligation on the seller to convey or upon the purchaser to buy.
REQUEST TO COMPEL ATTENDANCE OE WITNESSES
Just before the trial concluded and after it had run for approximately three weeks, the court was requested by the plaintiff in Action No. 2 to take steps to compel other witnesses to appear, it being alleged that such witnesses had been subpoenaed. The proofs pertaining to the subpoenaing of these witnesses were not of such strength as to enable the court to say that a proper subpoena had been issued. In any event, however, the offers of proof to be given by these witnesses clearly indicated that such testimony would have gone only to the fact that there had been other offers. The testimony of these witnesses would not have reached in any manner the question of the joining of the alleged conspiracy by the defendant purchaser, Beal Property Owners, Inc. There was no testimony which it was claimed could have been brought in to show that there had been any wrongdoing on the part of the purchaser under the contract of sale. Thus, even if the testimony which these witnesses allegedly would have given had been brought into the case, it could not and would not have changed the result in this litigation.
MICHAEL GRACE AND HIS LEGAL REPRESENTATION
Because there were certain aspects of the trial of these consolidated actions which the court regards as unusual, it is necessary to comment upon them. These actions were long-delayed in being brought to trial. The contract of sale itself was executed in May, 1955. Michael Grace, as has been earlier pointed out, energetically participated in the negotiations which preceded its final execution, thoroughly examined the instrument, initialled it in numerous places and is a signatory thereto in three separate capacities. After the execution of the contract of sale Michael Grace did his utmost to delay the delivery of the deed and to prevent the approval by the Supreme Court of the sale of the incompetent’s interest. When the actions appeared on the calendar for trial they were delayed time after time. They should have been tried in May or June of this year but they went over the summer recess and through the Septem *553 her, 1957 Term and finally came on for trial in October. The dates upon which the actions appeared on the calendar are set forth in the record and they are numerous.
It was known from statements of counsel that the trial of these actions would take almost a full month to complete. Nevertheless, on the opening day of the October Term Edward T. O’Brien, Esq., appeared, asking leave to be substituted as the attorney defending Michael Grace in his capacity of a defendant in Action No. 2 against his son’s complaint to have the contract set aside. At that particular juncture he was represented by Charles Haydon, Esq., of counsel for the firm of O’Dwyer & Bernstein, in his capacity as plaintiff in Action No. 1 and at the same time his wife, Corinne Grace, in her capacity as guardian ad litem of the Grace’s infant son in Action No. 2, was represented by Arthur H. Bose, Esq.
The court denied an adjournment to enable the proposed incoming attorney to prepare himself for trial. There were two lawyers fully prepared on the same side of the action as Michael Grace stood on, namely, Mr. Haydon and Mr. Bose, and they were both present in the courtroom ready to proceed. After a few days of trial, Mr. Bose retired from active participation in the trial, although he remained as attorney of record. In his place his associate, Louis Schultz, Esq., took over in behalf of Corinne Grace, guardian ad litem of the infant plaintiff, Michael Grace, Jr., in Action No. 2. Later, after the trial had progressed for more than a week, Mr. Haydon, trial counsel for Michael Grace in Action No. 1, came in at the opening of court on a Tuesday morning and asked to be relieved of his obligation to go forward with the case. He stated that the evening before there had been a sharp interchange between Michael Grace on the one hand and Mr. Bernstein and himself on the other and that the things which had been said to Mr. Bernstein and himself by Michael Grace were of such a nature that he, Mr. Haydon, could not go on with the trial. An application was made for an adjournment and, although the court did not relieve Mr. Haydon of his obligation to continue in the case, an adjournment was granted from that Tuesday morning until the following Monday at 10:00 a.m. with the understanding that Mr. Haydon and Michael Grace would settle their differences in the meantime so that Mr. Haydon would proceed as Michael Grace’s counsel or Michael Grace would come to court with new counsel prepared to proceed without further adjournment. Michael Grace did come on the following Monday with new counsel who informed the court that he would take over the prosecution of Action No. 1 on the plaintiff’s side provided he *554 wag grafted a two weeks ’ adjournment to prepare for that role. This request for an adjournment, in the exercise of the court’s discretion, was denied in view of the fact that the case had been in progress for a considerable length of time and because it was the view of the court that it was completely unfair to the defendants, who were blameless, to put them through the expense of delay and the general inconvenience attendant upon such an adjournment. It was the court’s further view that to grant the requested adjournment would seriously upset the routine of the court since the Trial Justice presiding was assigned to Special Term, Part II, for the month of October and it was calculated that this litigation should be disposed of during that period. Had a two weeks’ adjournment been granted it would have disrupted calendars and assignments into the succeeding months. Accordingly, the adjournment was denied. Thereupon the prospective substituted attorney withdrew and the court requested Mr. Haydon to continue and he did stay on in the case and prosecuted it until one morning Michael Grace appeared and, in person, asked the court that Mr. Haydon do nothing further, which position he backed up with telegrams which he sent to counsel and the court.
There was available to Michael Grace throughout the full term of the trial the services of the lawyer whom Oorinne Grace had retained on behalf of Michael Grace’s son. During the course of all the trial Michael Grace and Oorinne Grace attended daily, conferred freely and Michael Grace himself, as the record will show, conferred throughout the trial with Mr. Schultz who was prosecuting the action in behalf of the infant plaintiff, Michael Grace, Jr. The court also extended to Mr. Schultz the right to examine in respect of the allegations of the complaint in Action No. 1 and the issues raised in both Action No. 1 and Action No. 2. There was every opportunity for Michael Grace to have tried to have had the benefit of counsel and to have presented in full the entire matter which is the subject of this litigation. The plaintiffs’ side of this litigation took almost three weeks of actual trial and within that period, for a case of this nature, there was a full and fair presentation of the issues. Mr. Haydon, until he was forbidden by Mr. Grace to do so, presented the plaintiff’s case in Action No. 1 with skill and thoroughness. Mr. Schultz’s presentation of the plaintiff’s case in Action No. 2 and his questioning as to the issues in both actions was characterized by similar skill and thoroughness. Whatever motives Michael Grace had for delaying the trial were not fully clear to the court. He has, however, continued to *555 Uve in the property covered by the contract, substantially rent-free since the contract was signed.
Throughout the trial Michael Grace was accorded and took advantage of the opportunity to make statements at times when he was not under oath and this was noted in the record. From time to time he urged upon the court that he was unfairly dealt with claiming that he was not represented by counsel. The fact is, however, that he had a long succession of attorneys in and out of the negotiations which led to the contract of sale and in this particular litigation as well as others connected in greater or lesser degree with it. On one occasion during a luncheon recess Michael Grace met James E. Boboras, Esq., a lawyer of his acquaintance, and brought him back to the courtroom for the afternoon session. Mr. Boboras sat at the counsel table and assisted Mr. Schultz. During the progress of the trial on that afternoon Mr. Boboras spoke up from time to time in reference to the progress of that particular session. He was not seen or heard of again in the litigation after the close of that afternoon session. No explanation of his subsequent nonappearance was given.
Mr. Haydon, at the court’s direction, was present at every session and remained throughout the trial ready to examine witnesses and to proceed except for the fact that Michael Grace requested that he not do so. No delay in the course of the trial beyond the delay from Tuesday morning to the following Monday morning already described was permitted. The court deemed itself justified in adhering to this position because (1) consideration of fairness to the defendants required it; (2) expedition of the court’s business required it; (3) there was counsel actively presenting the case fully against the defendants on behalf of Michael P. Grace, Jr.; and (4) it might well be inferred from the long succession of lawyers retained by Michael Grace that his bad relationship with one lawyer after another was not without some fault on his part. It may be noted in passing that some phase of the matters in dispute in this litigation has been considered in each of the following reported decisions (Matter of Grace, 2 N Y 2d 822, supra; Grace v. Deepdale, Inc., 3 A D 2d 397; Matter of Grace, 2 A D 222, supra; Grace v. Grace, 155 N. Y. S. 2d 336). No less than a dozen attorneys, either as attorneys of record or of counsel, have represented Michael Grace and Corinne Grace, his wife, in this litigation and the cases just enumerated. Michael Grace testified during the trial that he attended three law schools although he had never taken a degree in law nor become *556 admitted to practice in any court of the country. During the trial Michael Grace was continuously in attendance, except for short intervals of time. When present in the courtroom he sometimes occupied a seat in the spectator section from which position he frequently dispatched his wife, Corinne Grace, with oral or written messages to Mr. Schultz. At other times he occupied a seat at the counsel table and when there he conferred orally and in writing with Mr. Schultz. From time to time Michael Grace conferred with witnesses both in and out of the courtroom. His statements made when not under oath and noted in the record, as earlier mentioned, were at times delivered from a point in the spectator section of the courtroom and at other times from the counsel table. The demeanor of Michael Grace and his conduct in and about the courtroom during the trial showed clearly that he assumed general direction of the litigation on his own account.
CONCLUSION
On the basis of all the testimony and proofs before the court it is determined that the defendants are entitled to prevail in both actions. All motions made by the defendants both at the close of the plaintiffs’ respective cases and at the close of each entire case are denied except the motions for judgment made in behalf of the several defendants and these motions for judgments are granted.
There remains the matter of the counterclaims and cross claim of the defendant, Real Property Owners, Inc., in which that defendant seeks a judgment directing specific performance of the contract of sale dated May 6, 1955. This counterclaim and cross claim for specific performance is well taken. The defendant, Real Property Owners, Inc., in good faith and in reasonable reliance upon specific provisions of the contract of sale, has expended over $400,000 upon the land which is the subject matter of this litigation. It did so under the express provision of the contract of sale contained in paragraph numbered “ Sixth ” opposite which appears the initials of Michael Grace. That provision permitted the entry by the purchaser on the land before title passed for the purpose of making surveys, test borings and the commencement of construction of an eighteen hole golf course. It went forward relying on the good faith and honor of the signers of the contract of sale. It did not contemplate that Michael Grace, who had been the principal negotiator on the seller’s side and who had taken so long to investigate, confer, consult and make up his mind, would seek to recant his decision and upset the agreement. The pur *557 chaser was fully within its rights and its reasonable expectations in making these expenditures. Absent any showing of wrongdoing on the purchaser’s part, it would be highly unjust and inequitable to require it to relinquish its rights under the contract and to .turn back to the sellers land as it now is improved. This would unjustly enrich the sellers.
Charles Grace and Peter Grace have conveyed their interests in the land to the purchaser as they were obligated to do by the contract of sale. The purchaser is ready, able and willing to perform under the agreement, to make all payments, execute all papers and accept delivery of deeds to the remaining interests outstanding. It has tried to fix a time for closing but Michael Grace has resisted, maintaining that he should not be required to perform. The defendant purchaser, Beal Property Owners, Inc., is entitled to a judgment for specific performance as prayed for in its answer in each action. The court further finds that the defendants in Action No. 1 are entitled to recover their costs and disbursements against the plaintiff, Michael Grace, in his individual capacity only. No costs are awarded against Michael Grace in his capacity as a testamentary trustee in Action No. 1. The court awards no costs in Action No. 2.
This constitutes the decision of the court pursuant to section 440 of the Civil Practice Act.
Settle judgment on notice.